**UNION MUT. INS. CO. v. PAGE et al.**

No. 7038—Opinion Filed Jan. 2, 1917.

Rehearing Denied April 10, 1917.

(164 Pac. 116.)

**1. Principal and Surety—Liability of Surety —Note.**

The general liability of a surety upon a note, account, or bond, is not conditioned upon the exercise of diligence by the holder of the obligation to collect of the principal, and the negligence or passive inactivity of the holder is not a defense available to the surety.

**2. Same—Proceedings Against Principal— "Require"—Statute.**

The term "require," as used in section 1058, Rev. Laws 1910, which provides that "a surety may require his creditor to proceed against the principal, * * * and if in such case the creditor neglects to do so, the surety is exonerated to the extent to which he is thereby prejudiced," means, to demand; to insist upon; to claim as by right and authority; to exact; to claim as indispensable, a synonym as understood by its use in this section, for exact; direct; order, and a simple suggestion to, or request of, the creditor will not suffice.

**3. Same—Request to Sue Principal.**

The failure of the payee of a promissory note to sue the principal, upon the oral request of the surety sued, made to the collector or attorney of the creditor, who had the note for collection, without any showing that the collector or attorney was authorized by the creditor to take legal proceedings for the collection of the note, or that such request or notice was communicated to the creditor by the collector or attorney, will not operate as a release of the surety sued, even though the principal at the time the request was made was solvent and amply able to pay the note and in the meantime he had become insolvent, for the reason that it is the duty of the surety upon the failure of the principal to pay the note when due, to pay the same and pursue his remedy against the principal to reimburse himself for the amount paid as such surety for his principal.

(Syllabus by Robberts, C.)

Error from District Court, Washita County; James R. Tolbert, Judge.

Action by the Union Mutual Insurance Company against Hattie Page and J. H. Hays. Judgment for defendant Hays, and plaintiff brings error. Reversed and remanded, with instructions to render judgment for plaintiff for full amount of note sued on.

Wilson & Scott and S. C. Burnette, for plaintiff in error.

Richard A. Billups, for defendant in error Hays.

Opinion by ROBBERTS, C. This action was brought by the Union Mutual Insurance Company, plaintiff in error, against Hattie Page and J. H. Hays, defendants in error, to recover on a promissory note given by defendants to plaintiff as premium for hail insurance policy on 60 acres of cotton for the season of 1911. The note is as follows:

"Hail Insurance.

"$76.00 Enid, Okla., March 18, 1911.
"On or before the first day of October of this year, for value received, I, we, or either of us, promise to pay to The Union Mutual Insurance Company, of Enid, Oklahoma, or order, the sum of seventy-six and 50/100 dollars, payable at the office of said company in Enid, Oklahoma.

"This note is given for premium for insurance on my crop of grain, now growing on the W. ½ of section 1, township 11, range 20, and on the —— acres in all, situated in Washita county, state of Oklahoma, and this indenture, made on the day above written, and between the undersigned and the said company, witnesseth: That the undersigned mortgages to said company the said crop of grain, as security for the payment to said company the above named sum of money on or before the first day of October of this year, and this mortgage shall also cover said grain wherever located after it is harvested. This note to bear interest at 10 per cent. per annum from date, if not paid at maturity. Without interest if paid when due. I agree to pay an attorney fee of ten dollars, if it becomes necessary to collect the above sum of money or any part thereof by law, or if it be placed in the hands of an attorney for collection.

"Hattie Page.
"J. H. Hays.

"Witness: Aug. Gumuster.

"Policy No. 05475.

"P. O., Canute."

No service was had upon defendant Page. Defendant Hays answered as follows:

"Comes now the defendant, J. H. Hays, and for answer to plaintiff's bill of particulars denies each, every, and all allegations therein, except such as are hereinafter specifically admitted.

"First. Defendant J. H. Hays admits that he signed the note named in plaintiff's bill of particulars as a surety, and accommodation signer, and received no benefits in consideration therefor, believing that said company was lawfully authorized by the state of Oklahoma to write the kind of insurance that the principal of said note, Hattie Page, desired, to wit, hail insurance on a cotton crop. That on or about the date of the policy here involved, to wit, March 21, 1911, the State Insurance Commissioner, Hon. Perry A. Ballard, revoked the license of said Union Mutual Insurance Company, stating that said company has no legal right to write hail insurance on crops at that date. That by reason of the foregoing state of facts, consideration for which this defendant, J. H. Hays, signed said note never lawfully existed, or if the same ever existed it wholly failed when the said Insurance Commissioner revoked the license of the said company.

"Second. For a further answer and defense, defendant alleges that the plaintiff herein, in the fall of 1911, and after said note was due and collectable, neglected, failed, and refused to make an effort to collect said note from the principal, Hattie Page; that this defendant, J. H. Hays, asked and requested plaintiff to proceed to collect said note while the principal was in possession of a cotton crop from which this note could have been made, if the same was legal; that this defendant informed plaintiff at the time referred to herein that said cotton crop was all the protection that he as a surety had; and that he, defendant, J. H. Hays, wanted this matter settled at once for his protection; that by reason of plaintiff's failure to so proceed against said principal, Hattie Page, as requested, said cotton has been disposed of by Hattie Page, and said Hattie Page is insolvent and has no means out of which any part of said debt can be made, to the damage of said defendant to the amount of his liability, and said note."

Upon these issues, trial was had to a jury, verdict returned for defendant, and judgment rendered against plaintiff for costs. Plaintiff brings error.

It is apparent from the verdict that the jury found for this defendant on the allegation that he was only surety on the note, and. while there might be some question as to that fact, we will adopt the finding of the jury and consider the case upon that theory.

This brings us to the proposition as to whether the defendant Hays was released and relieved from payment of the note because of the laches of the plaintiff in failing to proceed against the principal, or taking some steps to obtain payment out of the cotton belonging to the principal and pointed out to the agent of the plaintiff about the time of the maturity of the note. In support of his defense upon that theory, the defendant relies on section 1058, Rev. Laws 1910, which is as follows:

"1058. A surety may require his creditor to proceed against the principal, or to pursue any other remedy in his power which the surety cannot himself pursue, and which would lighten his burden; and if in such case the creditor neglects to do so, the surety is exonerated to the extent to which he is thereby prejudiced."

We gather from the record that the defendant relies principally upon that part of the section above quoted which provides that a surety may require his creditor to proceed against the principal, and, if the creditor fails to do so, the surety is exonerated to the extent to which he is thereby prejudiced. The particular steps taken by defendant Hays to require the plaintiff to proceed against the principal are detailed in his testimony given at the trial, as follows:

"A. She got the crop insurance provided I signed her note. I signed her note. She wanted it signed for hail insurance, and I signed it. Q. Had she signed the note at the time you did? A. Yes, sir. Q. And came to you afterwards? A. Yes, sir. Q. Did you have any conversation with the company or any of its agents with reference to this note in the year 1911? A. I did. Q. Tell the jury what it was. A. I had no further conversation until fall. The first conversation I had with the agent was in the spring. That fall there came another man, a collector. Q. State whether or not he had this note for collection? A. He did. Mrs. Page refused to pay it, and so did I. I says, 'There's two bales picked there, three picked, two on the ground and one on the wagon.' I says, 'You go and attach that cotton.' Q. What further statement did you make to him, if any, about attaching the cotton? A. I told him to go ahead and attach the cotton and get his money out of it. Q. Did you tell him in what capacity you had signed the note? A. Yes, sir; he said he didn't want to attach the cotton. He would rather not, but he finally said he would, but he never did attach it. I told him if he would attach the cotton the parties would undoubtedly make a replevin bond and sell the cotton and he would have a bond the court would take, which would be much better than a note on me and he would get his money. That was the only chance he had on

it—for him to take the cotton. I couldn't get it. Q. What became of the cotton? A. Mrs. Page sold the cotton. Q. About how much cotton was picked and in the field at the time? A. I believe at that time there had been about five bales sold, and I think the crop made about 23 bales. There was three bales picked at that time, or a little better. Q. There was about 18 in the field and on the ground and the wagon? A. Something like that. There was five bales already sold and three bales picked, and the rest was in the field. Twenty-three bales out of the whole crop. Q. Where is Mrs. Page at this time, if you know? A. I don't know. Q. Do you know whether she has any property at all in this country, or anywhere else? A. If she has any, I don't know of it. Q. Did she have anything at that time except this cotton? A. She had a few stock. Q. Do you think there was ample cotton at that time to settle this debt? A. There was enough cotton picked there to settle it then. Q. Do you remember who the gentleman was who came and talked to you in October? A. Said his name was Webb. Q. You say you told Mr. Webb to go and attach the cotton? A. Yes, sir. Q. Was that in writing? A. No, sir. Q. You never did give the company any written notice? A. No, sir. Q. You never did offer to pay the expenses or indemnify them against any expense in the matter? A. No, I never did. Q. The only reason you didn't protect yourself was from the fact that you thought you had a way to beat the note? A. Well, I just looked at it like this: I would have to pay the note out of my own pocket, and I couldn't get anything out of her, and if they couldn't I didn't think I could. Q. Why didn't you when you saw that Mrs. Page was disposing of this security that was behind that note that you proposed—why didn't you say something to Mrs. Page about paying the note? A. We did talk about it. Q. Did you ever suggest to her to pay the note? A. I told her I would like to get it off of my hands. Q. When she was telling you what she thought she could do from her advice, did you take any steps or make any remonstrations against her not making security against the note? A. No. Q. You never requested her to make you safe in any way so in case of litigation you would be protected? A. Yes, sir; she told me she was going to leave, and she says, 'If you ever have any trouble about that, I'll pay it.' But she says, 'You'll have never any trouble about it.' Q. And on that assurance from her you let the matter drift and paid no more attention to it? A. That's all I could do. Q. John, when did you last see her? A. I haven't seen her since she left the farm. Q. When did she leave? A. I don't know when she left, whether the first of 1912 or the last of 1911, but some time either the first of that year or the last, some time along there. Q. Where is she now? A. I don't know. Q. At that time she had some stock you say? A. Yes, sir. Q. And she was leaving the state, you say? A. Well, I don't

know whether she was moving them to—somewhere in the northern part of this state. I forget the name of the place now. Q. The note was then past due? A. Oh, yes. Q. You made no effort to secure yourself at all? A. No. Q. You rested on the assurance or the advice you had received that this company couldn't collect it because of the invalidity of the company as a corporation? A. Well, yes; that's about all there was to it. Q. You didn't think the company had any right to sue you? A. Yes, sir. Q. That was your advice? A. Yes, sir. Q. You went and sought counsel about it? A. Yes, sir. Q. And because of the defense you had on its organization and right to do business in this state—that was the reason you didn't pay it? A. Yes, sir. Q. This crop matured, and Mrs. Page held the policy all during the season of 1911? A. Yes, sir. Q. You retained the policy and received the benefits? A. Which benefits? Q. You had the insurance on the crop? A. She had the insurance. Q. I understand. Your note was outstanding at that time? A. Yes, sir; the note was outstanding at that time."

There is testimony tending to show that at the time the collector demanded payment of the notes, being the time the conversation above related, was had, the agent promised defendant that he would attach the cotton pointed out to him as belonging to Mrs. Page: but for some reason, which is not explained, he did not do so. There is no evidence on behalf of defendant Hays that he relied on that promise. There is no evidence tending to show that the agent had authority to bring the action, nor that he ever communicated the defendant's request to the company. There is no evidence tending to show that legal grounds existed for attachment against the principal. There is no evidence tending to show that Hays made any other or further effort to require the plaintiff to proceed against the principal. There is no evidence tending to show that the defendant notified the company or its agent that, in case the plaintiff failed to proceed against the principal, he, as surety, would hold himself discharged. The full purport of the evidence is that Hays, for his defense, relied upon the fact that the plaintiff could not recover because the plaintiff's license to transact business in Oklahoma had been revoked. At the conclusion of the testimony, the court gave the following instruction, among others:

"If you find and believe from a preponderance of the evidence of this case that the defendant Hays signed said note as surety, that when the plaintiff presented said note for collection after its maturity the defendant Hays notified the plaintiff that he was surety on said note only, and requested and demanded of the plaintiff that they proceed

and take legal steps to enforce collection of the note against the principal, Mrs. Page, by attachment of her cotton, and that the company failed to do so, and that by reason of such failure the defendant Hays has been damaged to the full amount of the note sued upon, if you so find, your verdict should be for the defendant J. H. Hays; otherwise, you should find against him, and in favor of the plaintiff for the full amount of the note sued on."

It is apparent from the language of this instruction that the trial court was of the opinion that all that was necessary to a complete exoneration on the part of the surety was to notify or request the creditor to proceed against the principal. Nor do we overlook the fact that the word "demand" is used in the instruction, but the evidence does not justify in any sense the use of that word. There is no evidence even tending to show that the defendant demanded that the creditor proceed against the principal. The proof is simply to the effect that the defendant suggested or possibly requested the creditor to attach certain property belonging to the principal. As we view the authorities, this is not sufficient. Many of the authorities go to the extent of holding that:

"An unheeded request by a surety that the creditor proceed against the principal, after the maturity of a note, and while the principal is solvent, will not operate to discharge the surety, although the principal afterwards becomes insolvent, unless, accompanying the request to proceed against the principal, there is an explicit notice that, in case the creditors shall fail to sue, the surety will hold himself discharged." Kennedy v. Falde, 4. Dak. 319, 29 N. W. 667.

We do not base this opinion solely upon the fact that defendant failed to notify the creditor that he would "hold himself discharged if it failed to proceed against the principal," but cite the rule simply for the purpose of showing the extent to which some authorities go, the strictness to which the surety is held to bring himself within the rule to obtain exoneration from liability. It is well settled that a simple request to proceed against the principal is not sufficient. In the case of Kennedy v. Falde, supra, the language of the surety to the creditor was, "You had better collect the sum from Mr. Falde." Perhaps not quite as strong as the language used in this case, but in speaking to that point the court says:

"Can it be claimed that such language was a requirement made upon the principal to proceed and collect the sum from Falde, and, if he neglected so to do, the surety would consider himself released? Clearly not. To require is 'to demand; to insist upon having; to claim as by right and authority; to ex-

act; to claim as indispensable'—a synonym. as we understand its use in this section, for 'exact'; 'direct'; 'order.'

"If all the other modes provided by law for the protection of a surety are by him to be disregarded, no action upon his part, under the provisions of section 1681 (Dakota, same as section 1058, Rev. Laws 1910, Okla.), will be deemed a compliance with its provision, which falls short of a clear notice to the creditor that he expects and requires him to proceed in collection of the debt against the principal. Such a demand must be made that the creditor should understand that the wish and direction of the surety to him is to proceed against the principal in the collection of the debt. No requirement susceptible of any other construction will be sufficient. Applying this rule to the language used in the case at bar, it will be seen it falls far short of such a 'requirement' as is contemplated by statute."

It is definitely settled by the common law, as well as numerous decisions in this state, based upon statutory enactments, that:

"The general liability of a surety upon a note, account, or bond is not conditioned upon the exercise of diligence by the holder of the obligation to collect of the principal, and the negligence or passive inactivity of such holder is not a defense available to the surety."

It is also held by numerous authorities that notice of the surety to an agent or attorney of the creditor would not suffice unless the authority of such agent or attorney is made to appear by the evidence. Cummins v. Garretson, 15 Ark. 132; Driskill v. Washington County, 53 Ind. 532; Sapington v. Jeffries, 15 Mo. 628; Adams v. Roane, 7 Ark. 360; Bartlett v. Cunningham, 85 Ill. 22; Shimer v. Jones, 47 Pa. 268; Hellen v. Bryson, 40 Pa. 472.

Measuring the instruction of the trial court now under consideration by the foregoing rules, it must be apparent to all that it cannot be approved, and that prejudicial error was committed by the court in so instructing the jury.

The recent decisions of this court clearly settle the doctrine in this state upon the questions under consideration here in favor of the contentions of plaintiff in error. In the case of Palmer v. Noe, 48 Okla. 450 150 Pac. 462, 464, the court says:

"* * * Section 1056, Rev. Laws 1910, provides when sureties may be exonerated, and this section is as follows: 'A surety is exonerated: First, in like manner with a guarantor; second, to the extent to which he is prejudiced by an act of the creditor which would naturally prove injurious to the remedies of the surety or inconsistent with

his rights, or which lessens his security; or, third, to the extent to which he is prejudiced by an omission of the creditor to do anything, when required by the surety, which it is his duty to do.'

"Section 1058, Rev. Laws 1910, provides that a surety may require the creditor to proceed against the principal, under certain conditions. This section is as follows: 'A surety may require his creditor to proceed against the principal, or to pursue any other remedy in his power which the surety cannot himself pursue, and which would lighten his burden; and if in such case the creditor neglects to do so, the surety is exonerated to the extent to which he is thereby prejudiced.'

"The defendant insists that, under section 1058 and subdivisions 2 and 3 of section 1056, he is released from liability upon the note sued on, for the reason that the plaintiff failed to comply with the oral request made to his attorney to proceed against the principal and sureties upon said note at a time when the principal was solvent and amply able to pay the debtor, and that in the meantime the principal and the other sureties became insolvent, and that his failure to so proceed prejudiced his rights and remedies against the principal and his cosureties. With this contention we cannot agree. It was not the duty of the plaintiff to sue the principal, and not being his duty, his failure to do so was not prejudicial to the rights and remedies of the defendant. The defendant obligated himself to pay the debt, and, upon the failure of the principal to pay it, at maturity, it was his duty to pay it and proceed against the principal and his cosureties under section 1061, Rev. Laws 1910.

"Plaintiff had the option to sue any or all of the makers of this note, and, having this option, his failure to comply with the oral request of the defendant would not operate as a release of liability. If, as a matter of fact, the principal and the other sureties thereon were solvent, it was the plain duty of the defendant to pay the obligation and proceed to protect himself under the statute."

Later in a similar case, Miller v. State ex rel. Lankford, 52 Okla. 76, 152 Pac. 409, this court adopted and approved the doctrine in Palmer v. Noe, supra, in the following language:

"On the merits, the question presented in this case cannot be distinguished from Palmer v. Noe, 48 Okla. 450, 150 Pac. 462; 'Under section 4694, Rev. Laws 1910. the payee of a promissory note may, at his option, sue one of the sureties, without joining the maker and the other sureties as parties defendant; and his failure to sue the maker and other sureties does not operate as a release of the surety sued. The failure of the payee of a promissory note to sue the principal, upon the oral request of the surety sued, made long after the maturity of the

note to the attorney of the payee, who had the note for collection, does not operate as a release of the surety sued, even though the principal, at the time the request was made, was solvent and amply able to pay the note, and in the meantime he and the other sureties thereon became insolvent; it being the duty of the surety, upon the failure of the principal to pay the note when due, to pay the same, and pursue his remedy against the principal and his cosureties.'

"Counsel for the plaintiff in error has earnestly requested us, in a well-considered brief, to reconsider the question decided in that case and overrule it. But, after a careful consideration of the authorities, we are satisfied that that case was rightfully decided, and in addition the importance of adhering to the decisions of this court once made, and thus preserving a conformity in the law, cannot be overestimated."

Other questions are presented in this case, but we deem it unnecessary to discuss them. The section under which the defense is made came from Dakota, and was adopted here in early territorial days. The case of Kennedy v. Falde, supra, was decided by that court long before the section was adopted here, and became a part of the law of this state. The construction has been approved and consistently followed by numerous decisions in this court, and cited with approval by a number of the courts of last resort in sister states.

The case should be reversed and remanded to the district court of Washita county, with instructions to render judgment for the plaintiff for the full amount of the note sued on, in accordance with the terms and provisions of said note.

By the Court: It is so ordered.